In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-19-00316-CV**
_____

**IN THE INTEREST OF J.L.V.**

_____

**On Appeal from the 253rd District Court**
**Liberty County, Texas**
**Trial Cause No. CV1813005**
_____

**MEMORANDUM OPINION**

In this accelerated appeal, both Mother and Father challenge the trial court's termination of their parental rights to their seven-year-old son, Jack.[1] After a bench trial, the trial court entered an order terminating Mother's parental rights finding clear and convincing evidence supporting termination under subsections 161.001(b)(1)(D), (E), and (O) of the Family Code and that termination of her rights

_____

[1] We identify children and their family members in parental-rights termination cases by using either initials or an alias to protect the identity of the children. *See* Tex. R. App. P. 9.8(a), (b).

1

was in Jack's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O), (2). The trial court also terminated Father's parental rights after finding clear and convincing evidence supporting termination under subsection 161.001(b)(1)(Q) of the Family Code and that termination of his rights was in Jack's best interest. *See id.* § 161.001(b)(1)(Q), (2). Mother and Father timely appealed.

In four issues, Mother challenges the sufficiency of the evidence supporting the trial court's statutory predicate findings and the finding that termination of her parental rights was in Jack's best interest. In three issues, Father challenges the sufficiency of the evidence supporting the trial court's predicate finding and the finding that termination of his parental rights was in Jack's best interest. We affirm the trial court's judgment in part and reverse and remand in part.

## I. Background

On February 16, 2018, the Department of Family and Protective Services (the Department) filed an Original Petition to terminate the parental rights of Mother and Father. Department Investigator Chantelle Miller's Affidavit in Support of Removal, attached to the Original Petition, contained these allegations:

> On February 11, 2018, the Department of Family and Protective Services received a referral alleging Neglectful Supervision of [Jack],

age 6, oldest victim by Caregiver [Mother's boyfriend's mother] and Marcus [(Mother's boyfriend)].[2]

The following intake was received:

> Mother is in jail and Father is in prison. Victim child resides with mother's boyfriend's parents. Caregiver lets mother's boyfriend have access to victim child even though mother's boyfriend is not supposed to be around victim child, which may place victim child in unsafe situations. The reason mother's boyfriend should not be around victim child was not provided. The victim child also out cried that the caregivers would withhold food when the child was reported to be bad at school.

The Affidavit also stated that a Department caseworker spoke with the Assistant Principal of Jack's school and that the Assistant Principal was concerned because Jack had "severe behavior issues" and Marcus's mother told her that Jack had slept at Marcus's residence. According to the Affidavit, "There was a previous case which closed on January 22, 2018 where [Marcus] was to only have supervised contact with [Jack] due to concerns for [Marcus] testing positive for methamphetamines and physical abuse of [Jack]."

According to the Affidavit, Miller interviewed Jack at school on February 14, 2018, and he did not appear to be malnourished. That same day, Miller visited Marcus's parents' residence, Marcus's parents denied withholding food from Jack,

---

[2] Our discussion of the Affidavit is limited solely for background information and will not be discussed in our analysis.

3

and Miller observed plenty of food in the home. Marcus's parents expressed concerns about Jack telling lies about them. The Affidavit noted that Marcus's mother wrote Mother a letter "telling her about [Jack's] behavior and that she wanted to get him on medication[]" but that when Marcus spoke to Mother about it, Mother got upset because she did not want Jack on medication. Miller stated in the Affidavit that on February 15, 2018, Marcus's parents decided that they would turn Jack over to the Department because they were concerned that Jack would "lie about more things[.]"

The Affidavit detailed Mother's CPS history before the current removal, noting the Department's involvement in 2012 and for three separate dates in 2014 with allegations against Mother as to both of her children, but the notation suggested these cases were closed. The Affidavit also included notations of an incident involving Mother in 2015 alleging she left her young toddlers alone at home while she went to the store to buy cigarettes. The Affidavit noted that there were immediate concerns Mother would leave the children unattended again. According to the Affidavit, after the police responded it was ultimately concluded that Mother knowingly left her children in the apartment alone, and the case was closed when the children were placed with Mother's daughter's paternal grandparents. The Affidavit also stated that Mother was convicted for abandonment/child

4

endangerment and noted that Mother received three years' probation for the offense. The Affidavit also contained an allegation about a report in 2016 against Mother as to Jack that "[t]he mother of a 4 year old is unable to adequately supervise the young vulnerable child. The mother is being arrested and there is no appropriate caregiver. Law Enforcement is requesting immediate contact from CPS." Jack was removed upon Mother's arrest because he had no safe place to go.

The Affidavit concluded that, considering Marcus's parents' decision that they would no longer care for Jack, Mother's current incarceration for probation violations, and Father's current incarceration, the Department should be named Jack's temporary managing conservator because Jack "has no one that is able to provide a safe and stable home environment for him."

## II. Evidence at Trial

Department Investigator Miller testified to initial allegations that Jack was left unsupervised around Marcus, who had a history of drug use, and that there was a concern that Jack's caregivers were withholding food from Jack when he had bad behavior at school. According to Miller, at the time of the investigation, both Mother and Father were incarcerated. Miller testified that Father had only seen Jack "once or twice in his life." Miller testified that Mother had voluntarily placed Jack with Marcus's parents because Mother had been arrested and taken to jail in Anderson

5

County for probation violations relating to her felony child endangerment conviction and a failure to pay child support for her daughter who does not live with her. Miller initially interviewed Jack, but the interview was "chaotic" because the child was hard to speak with and he was "very hyper and all over the place." Miller then interviewed the caregivers, Marcus's parents, and they denied that they withheld food from Jack. According to Miller, Jack also told her that whenever Marcus was around him, Marcus's mother was also there.

Miller testified that she was going to close the case because her investigation revealed no evidence to support the allegations, but the day after she visited Marcus's parents, she received a telephone call from them because "they were concerned that [Jack] was going to lie [about] them[,]" and they requested that CPS take custody of Jack. Miller asked them to keep Jack one extra night while the Department tried to find a placement. Miller testified she spoke to the Mother and Father on the telephone that day and they gave her some suggestions for placement, but none of the suggested people were available or none of them "panned out." Father suggested his sister who had several children of her own and said she would prefer for someone else to take Jack, and Father's brother could not help. Mother suggested her daughter's grandmother, but, after several attempts, Miller was unable to contact the grandmother. According to Miller, Jack was placed in a foster home,

6

but there was an incident at the foster home and Jack became aggressive, hit the foster mother, threw toys, said he said he wanted to die, and attempted to put his hands around his own throat to choke himself.

Jack was then taken to Kingwood Pines, a psychiatric hospital, for evaluation. Miller stated that Marcus's parents had not suggested that Jack had been suicidal while in their care, but Miller testified that she had been advised that Jack had ADHD and she agreed that "the Department was aware there were some issues, maybe not suicidal tendencies, but there [were] issues to be addressed." Miller acknowledged that the Department had been told that Jack had issues at school and behavior outbursts. According to Miller, Mother was aware of Jack's behavioral issues, did not want Jack on medication, and was trying to treat him through "alternative methods[,] . . . using . . . oils . . . like lavenders and things like that."

Department Supervisor Chris Vien testified that she had been assigned to Jack's case from the time Jack came into the Department's care. Vien testified that Jack was then currently in a group home because he cannot be placed in foster care due to his behavioral issues and the level of care he requires. Vien testified that when Jack was relinquished to the Department, Mother provided a few relative or fictive kin placement suggestions, but when contacted by the Department, the potential caregivers declined to take Jack. One placement recommended by Mother,

7

Michaela, complied with a home study, but the Department had concerns that Jack had not been in her home "in quite some time[,]" she did not know of the extent of Jack's behavioral issues "or what his diagnoses are[,]" she had a one-year-old and a five-year-old, and there was a question about her income because her expenses exceeded her income by $269 a month. Vien testified that the Department "tried and tried and tried[]" to reach out to Michaela to discuss the concerns but that Michaela would not respond for months. According to Vien, the Court Appointed Special Advocate (CASA) assigned to the case reported having the same "resistance" from Michaela, and it was not until the month of trial that Michaela reached out to the Department and the Department could "briefly go over some of the stuff[]" with her. Vien testified that the Department did not discuss the concerns in depth enough for her to feel comfortable placing Jack with Michaela. According to Vien, she is the one that decides to approve a home placement, and she needed more information about Michaela. The home study completed on Michaela was admitted into evidence.

Vien testified about the difference in the Department pursuing a permanent placement for Jack if the Department had permanent managing conservatorship without termination of parental rights, as opposed to the Department having permanent managing conservatorship with termination of the parents' rights:

Our hands are tied when we still have parental rights intact as far as seeking permanent placements. We would only -- if parental rights are not terminated, the only options for long-term placement would be [Michaela]. So if he came back into care, we would have -- because she couldn't handle him or for whatever reason, we would be going through the same thing we are right now of him being in a foster home, and when his behaviors get out of control, the foster -- that foster home or whoever putting in their notice and us having to move him. With parental rights terminated, some of the avenues that are taken, we can broadcast him. Do a broadcast for -- it's for foster parents who only want to adopt, and they get to pick and choose their -- their kids.

Or if this placement with [Michaela] worked, and she was able to adopt, she -- it would give her financial -- some financial income in regards to caring for [Jack] to help her.

Vien testified that termination of parental rights would increase the potential placements for Jack and that she believed it was in Jack's best interest to increase the odds that there would be a permanent placement found. Vien testified that it was in Jack's best interest to continue to have visitation with Mother until a potentially permanent adoptive placement is available. Vien also acknowledged that Mother reported she would financially support Jack if he was placed with Michaela.

Department caseworker Sharonda Easley stated that she worked with Mother on her service plan for about four months. Easley stated that Mother completed her parenting certification, her psychological assessment, maintained consistent contact with the Department, and had been working at a fast food restaurant for nine months at the time of trial. Easley testified that Mother had not cooperated with the

9

Department because Mother failed to appear for required drug tests, and Mother failed to identify family members for potential caregiver placements. In addition, Mother failed to obtain housing and to provide proof of individual or family therapy. Easley stated that at the time of trial, Mother had moved in with her friend, Michaela. Easley had not personally observed Michaela's home but testified that she reviewed the report of Michaela's home study and had the same concerns as her coworker Vien in placing Jack with Michaela. However, Easley stated that she addressed Jack's behaviors with Michaela and Michaela still expressed interest in taking Jack.

According to Easley, Mother attended all the meetings with the Department and visited her son consistently since her release from jail. Easley observed visitation between Mother and Jack and noted that Mother acted appropriately with Jack, the two were bonded, and that Jack was happy to see his Mother. Easley stated that although she believed it is in Jack's best interest to continue having visitation with his Mother, she also believed that termination of parental rights of both parents was in Jack's best interest for "long-term placement[,]" even if termination meant Jack would not get to see Mother.

The CASA testified that she had been assigned to the case for a little over a year and Jack had been in foster placement the entire time, except for when he was in the psychiatric hospital. The CASA stated that Mother did not provide any family

10

members for Jack's potential placement, and the first time she heard about Michaela was at a previous court hearing. According to the CASA, Jack was doing "about the same[]" at the time of trial as when she first saw him. The CASA testified that Jack has diagnoses of "ADHD[,] . . . aggression[,] and a mood behavior." The CASA testified that Jack was in his third placement at the time of trial in a "boys home[]" and had been there for three months. The CASA explained that there were many adults there, but none were specially trained, and, although it was not the best environment for Jack because his behavior was better when he has one-on-one attention, the placement was "definitely better than his previous [foster] placement."

The CASA believed adoption was in Jack's best interest but also did not believe that Jack's parents' rights should be terminated. The CASA clarified this by explaining that "what is best for this child is to be in a stable environment, to not be moved from place to place, which is what he's done his whole life. He needs a stable environment with someone who loves him unconditionally." The CASA acknowledged that some of "him being bounced around" was due to his psychiatric hospitalizations for his behaviors and the inability of the placement to control those behaviors. The CASA testified that she feared if the parents' rights were terminated, Jack would remain in the Department's care for years because of his behavior issues. The CASA testified that she "couldn't say" whether she believed Mother could

provide Jack with a safe and stable environment, and the CASA did not think it was a good idea for Jack to be placed with Mother after the trial. The CASA did not believe that Mother was financially stable or emotionally stable.

The CASA observed one visit between Mother and Jack almost a year before trial. The CASA testified that Jack "seems to want to see [Mother]" and "definitely wants to have a relationship with her." The CASA testified that at one of the visits she was concerned because Mother's boyfriend, Marcus, was with Mother at the visit and the CASA "felt like [Jack] didn't want to be near him or with him in that visit[,]" and it concerned the CASA that Mother was still living with Marcus. According to the CASA, Mother approached her and told her "there was some domestic violence going on[,]" the CASA and a Department representative offered to help Mother or get her to a shelter, but Mother did not take them up on their offers. Although the CASA did not believe it would be appropriate for Jack to live with Mother, she believed that "as long as [Mother] is willing to stay in his life and be supportive of him, then it would benefit him." The CASA agreed that the Department had no plan of a foster home or parent available to adopt Jack, if the parents' rights were terminated the Department would leave Jack with no family and no options at the moment, and that the only people interested in Jack were the parents and Michaela.

12

The CASA also had reservations about Jack being placed with Michaela. The CASA was provided the home assessment done on Michaela the day of trial, and because of this, the CASA had not talked to Michaela about placement or had time to follow up on any issues or concerns, which led to her reservations about placement. The CASA testified that she did not believe Michaela knew the extent of Jack's issues or behaviors and the CASA wanted "to discuss that with her before she takes this on." The CASA testified that the "glaring concerns" she had with the home assessment on Michaela was that "she continually stated that she didn't know of any -- any behavior issues with [Jack]. And -- and as being as that she has other children in the home, young children, that to me is a glaring issue." Another concern the CASA expressed was that Jack needed a lot of therapy and, because Michaela had other children and worked full time, the CASA assumed it would be difficult for Michaela to take him to and from those kinds of appointments. The CASA agreed that another concern was that the placement might not work out, and then it would be "yet another failed placement for this child[.]"

The CASA agreed that neither Father nor Mother could address Jack's needs and the CASA recommended that CPS maintain permanent custody, with the parents maintaining supervised parental rights. The CASA testified that she believed Mother should have limited supervised court-ordered access to Jack and that, once Father

was released from prison, the court could assess at that time appropriate contact and visitation between Jack and Father. The CASA explained that Jack wanted to continue to see Mother but had not expressed a desire to see Father because he did not know Father.

Mother testified that Father was incarcerated when Jack was born. According to Mother, when the case started in February 2018, she was incarcerated for failure to pay child support and for violating probation she was serving for felony abandonment and endangerment of her two children. Mother testified about the felony abandonment and endangerment charge and explained that her children were asleep when she asked a neighbor to watch them while she went to the store behind their apartments and the neighbor, who Mother later learned was high at that time, called the police on Mother. According to Mother, she pleaded guilty to the charge, but she claimed she only left the children under the supervision of her neighbor for less than twenty minutes. She explained that she could not fight the charges.

Mother testified she was placed on three years' probation in 2015 for child endangerment and she was incarcerated from December 2017 to May 2018 after she violated her probation by failing to notify her probation officer in Anderson County that she moved to Liberty County. She testified that she placed her son with Marcus's parents when she was arrested and that she had an agreement with them. Mother

14

testified that she also had a daughter and that her daughter's father had custody of her. Mother explained that she had court-ordered visitation with her daughter "every other week . . . for the weekend[,]" but that she had not had her daughter for a weekend in "a couple years." Mother testified that she was ordered to pay $213 a month in child support for her daughter but that "there's more being paid" because Mother was in arrears.

Mother explained that Marcus was her boyfriend when the case started in 2018 and that the relationship ended in March 2019. According to Mother, at the time of the trial Marcus was in a drug rehab for methamphetamines and alcohol. Mother testified that the last time she used methamphetamines was seven years ago. Mother testified that she had discussed Marcus hitting her or domestic violence with the CASA or the caseworker and that Marcus last hit her in March, less than six months before trial. Mother testified that she was given numbers to shelters and options, but she did not use them. Instead, Mother temporarily lived in her car and with a coworker before moving back to Athens and living with her friend, Michaela. Mother admitted that while Jack was living with Mother and before her relationship with Marcus, another boyfriend had hit her. According to Mother, that was "the pinpoint of where [Jack's] behavior [issues] started[.]" Mother testified that Jack had

15

behavior issues when he lived with her, she had enrolled him in behavioral health services with Tri County in 2017, and she used essential oils to calm him down.

Mother's service plan was admitted into evidence. Mother testified that she completed the parenting class and provided her certificate of completion to her caseworker. Mother testified that she also underwent a psychological assessment as required by the service plan. Mother testified that the service plan required her to secure employment and that, once she was released from incarceration, she worked at Sonic for almost nine months. According to Mother, the service plan required her to find safe and stable housing, and upon her release she had lived with Marcus until March 23, 2019. Mother testified that at the time of trial she was living with Michaela, and Mother was starting a new full-time "warehouse type job[]" in Tyler the following week making $11 an hour. She testified her service plan required her to submit to requested drug tests. According to Mother, she took "four or five" requested drug tests and most recently took one in June or July 2019, but she acknowledged that during 2019 she did not show up for "80 percent" of the drug tests because she was working. Mother testified that she had never been informed that she tested positive on any drug test she took during the case. Mother explained that she had been involved for six years with "Celebrate Recovery[,]" a "faith based recovery program[.]" Mother agreed that she used drugs in the past and that, because

16

she did not take all the required drug tests during the case, "there's not proof to this Court that [she was] actually clean and sober for the entirety of this case." Mother testified that her service plan required her to visit Jack every other week, that she visited him regularly, that the visits went "[p]retty good[,]" that she and her son are bonded, and that every visit they were happy to see each other.

According to Mother, after Marcus's parents asked the Department to take custody of Jack, Mother was physically unable to take care of Jack because she was still incarcerated. Mother testified that she remembered Miller calling to inform her that CPS was seeking for a placement for Jack but Mother "couldn't think of anybody who could actually take him." When asked why she did not provide Michaela's name to the caseworker as a potential placement, Mother testified, "I just didn't think of her name at that time[]" and because Michaela did not live nearby. Mother testified that Michaela was her former neighbor, that Michaela's mother "took [her] in as a daughter[,]" and that Mother provided Michaela's name to the caseworker at "[t]he last hearing[]" in February. According to Mother, she and Jack lived with Michaela right after Jack was born until he was "a year or two[,]" and Jack calls Michaela his "aunty[.]"

Mother testified that she wanted to maintain her parental rights, she believed it was in Jack's best interest for him to be placed in Michaela's home in Athens, she

17

was confident Michaela could care for Jack if placed there, and she wanted Michaela to be Jack's permanent managing conservator. Mother testified that she had a good relationship with Michaela, was willing to cooperate with Michaela, and was prepared to move out of Michaela's house if the court placed Jack there. However, she testified that she would need to get a couple of paychecks from her new job before she could afford her own place, which could mean the Department could take permanent custody of Jack because he may not be able to be placed immediately with Michaela. According to Mother, she would be able to participate in the care of her son and had researched schools, physicians, and resources in Athens for her son. Mother testified that she was willing to pursue counseling and behavioral therapy in Athens for Jack.

Mother testified she was prepared to support her child financially and to make monthly child support payments to Michaela for Jack's care if ordered to do so. Mother also testified that she was unable to provide financial support for the nine months she had been out of jail and been employed and Mother said she "was never told" to provide Jack financial support while he was in the Department's care.

Father agreed that the court in Anderson County ruled that he was Jack's father. Father testified that he was then serving a fifteen-year sentence for aggravated robbery, and a copy of his judgment showing his sentence started just a few months

18

before Jack was born was admitted into evidence. Father testified that he would be eligible for parole in early 2020, but agreed that in a "worst case scenario," he would not be out of jail until 2026. According to Father, while he had been incarcerated, he had participated in classes relating to gang rehabilitation, substance abuse, anger management, and cognitive intervention skills.

Father testified that he understood the Department was asking the trial court to terminate his parental rights to Jack. When asked whether Father believed the termination would be in Jack's best interest, Father answered, "I can't true -- truthfully answer that question." Father stated that he had only seen Jack twice, when his sister brought Jack to see him in prison. Father testified that he recommended several people for potential placement, including his sister, his brother, and a friend from high school, Michaela. Father admitted that before he was incarceration, he had substance abuse issues, and that his drugs of choice were methamphetamine and marijuana. Father testified he used drugs with Mother and they both liked methamphetamine and marijuana. Father testified that he was a member of a gang while he was out of prison and while he had been in prison. Father testified that he had drugs offered to him in prison, but he had turned them down. According to Father, he sent some letters and cards to Jack during the case. Father stated that although he made mistakes, he wanted the opportunity to be a father to Jack. Father

19

also testified that he had been in foster care and in his son's position, and Father understood what Jack was going through. He testified that he understood "not knowing my real father," and he wanted to provide emotional support to Jack and be present in his life.

Michaela testified that she had known Jack since birth, considered herself Jack's "adoptive aunt" but acknowledged that she had not had contact with Jack since 2016. Michaela confirmed that Mother lived with her at the time of trial and that Mother would be required to move out of Michaela's home if Jack was placed in her household. Michaela agreed she could "turn [Mother] away" if Mother attempted to violate any terms of a court order. Michaela testified that it would be her intention to be a permanent long-term placement for Jack and that she was prepared to have Jack in her home. Michaela acknowledged that Jack was a "challenging kid[]" and that she had been informed of his behavioral issues by his caseworker and his Mother. Michaela stated that although she has two other children living in her household, she believed that she could adequately provide for Jack's needs including taking him to counseling for his behavioral issues. Michaela stated that she lived in a two-bedroom apartment with her two children, she worked at an assisted living facility, and she could care for all three children. Michaela also testified that her extended family was willing to act as a support system for Jack.

20

Michaela did not believe it would be in Jack's best interest to have Mother's and Father's parental rights terminated but stated that the parents would have to demonstrate that they could be responsible parents. Michaela assured the court that she would protect Jack.

### III. Standard of Review

The decision to terminate parental rights must be supported by clear and convincing evidence—"the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). The movant must show that the parent committed one or more predicate acts or omissions and that termination is in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001(b); *In re J.L.*, 163 S.W.3d at 84. "The petitioner must prove both prongs and may not rely solely on a determination that termination is in the best interest of the child. *In re R.W.*, No. 01-11-00023-CV, 2011 WL 2436541, at *5 (Tex. App.—Houston [1st Dist.] June 16, 2011, no pet.) (citing *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)).

In reviewing the legal sufficiency of the evidence in a parental rights termination case, we must consider all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief

21

or conviction that the finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344–45 (Tex. 2009) (citing *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* In a factual sufficiency review, an appellate court must weigh whether the disputed evidence is such that a reasonable factfinder could not have resolved conflicts in favor of the finding. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). We give due consideration to evidence the factfinder could reasonably find clear and convincing. *In re J.F.C.*, 96 S.W.3d at 266. Stated another way, the Texas Supreme Court has explained that a review of factual sufficiency

> requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding. In a factual-sufficiency review, the appellate court must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding. Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true.

*In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018) (citing *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006); *In re J.F.C.*, 96 S.W.3d at 266).

Only one predicate finding under section 161.001(b)(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) (applying

22

previous version of the statute). Generally, we will affirm the termination order if the evidence sufficiently establishes any statutory ground that the trial court relied on in terminating parental rights as well as the best interest finding. *See id.* However, due process requires a heightened standard of review of a trial court's finding under subsections 161.001(b)(1)(D) or (E), even when another ground is sufficient for termination, because of the potential consequences for parental rights to a different child. *See In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019). Because subsection 161.001(b)(1)(M) alone provides a sufficient basis to terminate parental rights based on a previous subsection 161.001(b)(1)(D) or (E) finding, due process concerns and the requirement for a meaningful appeal require that, if a court of appeals affirms the termination on either of these grounds, it must provide the details of its analysis. *Id.* at 234-37. (citing U.S. Const. Amend. XIV, § 1; Tex. Const. art. I, § 19; *In re S.K.A.*, 236 S.W.3d 875, 890 (Tex. App.—Texarkana 2007, pet. denied)).

## IV. Father's Predicate Finding – Subsection 161.001(b)(1)(Q)

In his first issue, Father argues that the evidence is factually insufficient to support termination under subsection 161.001(b)(1)(Q). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(Q). Subsection Q focuses on the parent's future incarceration and on the parent's inability to care for the child. *In re H.R.M.*, 209 S.W.3d 105, 109–10 (Tex. 2006); *In re N.R.T.*, 338 S.W.3d 667, 675 (Tex. App.—Amarillo 2011, no

23

pet.). "In *In re A.V.*, we decided that [subsection Q] of the Texas Family Code applies prospectively and said, 'Thus, if the parent is convicted and sentenced to serve at least two years and will be unable to provide for his or her child during that time, the State may use subsection Q to ensure that the child will not be neglected.'" *In re H.R.M.*, 209 S.W.3d at 108 (quoting *In re A.V.*, 113 S.W.3d 355, 360 (Tex. 2003)). Subsection Q applies when the parent will be incarcerated for periods exceeding two years after a termination proceeding begins. *See In re A.V.*, 113 S.W.3d at 360–61.

> We employ a burden-shifting analysis to assess an incarcerated parent's ability to care for a child. The party seeking termination must first establish that the parent will remain in confinement for the requisite period. The burden then shifts to the parent to produce "some evidence" as to how he would provide or arrange to provide care for the child during his incarceration.

*In re C.D.L.R.*, No. 13-19-00008-CV, 2019 WL 2608776, at *9 (Tex. App.—Corpus Christi June 26, 2019, no pet.) (citations omitted).

While the Texas Supreme Court has explained that evidence of parole is relevant in determining the applicability of subsection Q to incarcerated parents, it has also stated that parole is "inherently speculative[]" and that a parent demonstrating the "mere possibility of parole" to prevent termination under subsection Q would "impermissibly elevate the burden of proof from clear and convincing to beyond a reasonable doubt." *In re H.R.M.*, 209 S.W.3d at 109. So, we must weigh all the evidence and not just the parent's testimony of the possibility of

24

parole in our analysis. *Id.* In that analysis we "give due deference to the [factfinder's] factfindings[]," instead of substituting our judgment for that of the factfinder. *Id.*

Father testified that he had been incarcerated since 2011 and he was currently serving a fifteen-year sentence for aggravated robbery. The record shows that the termination petition was filed in February 2018. Father testified that he was eligible for parole in February 2020, but if denied parole, his projected release date would be 2026. Father stated he was going to seek parole in "six to seven months[]" and confirmed he had a parole hearing scheduled for January or February 2020. While incarcerated, Father had participated in drug rehabilitation classes and gang rehabilitation programs.

Father testified that since being incarcerated in 2013, he had not provided any financial support for Jack, but Father testified that he asked his sister to help take care of Jack. Although Father testified that he believed his sister would take care of Jack on his behalf if requested, his sister did not testify and when the Department contacted Father's sister, she declined to take Jack. There was testimony that Michaela was willing to care for Jack, but Father testified that he had last communicated with Michaela in 2011 and Father had not asked Michaela to care for Jack.

After considering the evidence in its entirety, we conclude that the disputed and conflicting evidence is not so significant that a reasonable factfinder could not have resolved it in favor of its finding that Father's rights should be terminated. Father's testimony about the possibility of parole is mere speculation and would not prevent a factfinder from forming a firm belief or conviction that he would be incarcerated for longer than two years at the time of trial. *See id.* at 109; *see also In re K.R.L.*, No. 14-10-00187-CV, 2010 WL 4069351, at \*6 (Tex. App.—Houston [14th Dist.] Oct. 19, 2010, no pet.) (mem. op.) (explaining that although the appellant anticipated early release, his belief was speculative, and he provided no documentation to the trial court to support his belief). Likewise, the evidence is factually sufficient to show that Father's incarceration would prevent Father from caring for Jack and Father had not provided care for Jack while he was incarcerated. When the incarcerated parent has indicated that the support of the child will come from the incarcerated parent's family, there must be evidence of an agreement between the parties to assume the obligation to care for the child on the parent's behalf. *See Hampton v. Tex. Dep't of Protective & Regulatory Servs.*, 138 S.W.3d 564, 567 (Tex. App.—El Paso 2004, no pet.); *see also In re H.R.M.*, 209 S.W.3d at 110–11 (stating that the record must contain evidence that the caregiver agreed to care for the child on incarcerated parent's behalf); *In re Caballero*, 53 S.W.3d 391,

26

396 (Tex. App.—Amarillo 2001, pet. denied). There is no evidence that any of Father's relatives had agreed to care for Jack. We overrule Father's first issue.

**V. Mother's Predicate Findings – Subsections 161.001(b)(1)(D), (E), and (O)**

In her first, second, and third issues, Mother challenges the legal and factual sufficiency of the evidence to support the trial court's finding on predicate grounds D, E and O. Since an affirmative finding of endangerment under subsection D or E has potential consequences for a parent's rights to different children in future proceedings, we review these findings first. *See In re N.G.*, 577 S.W.3d at 235; *In re C.M.C.*, 554 S.W.3d 164, 171 (Tex. App.—Beaumont 2018, no pet.).

Subsection D permits the termination of a parent's rights if the trier of fact finds by clear and convincing evidence that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child[.]" Tex. Fam. Code Ann. § 161.001(b)(1)(D). Subsection E permits the termination of a parent's rights if the trier of fact finds by clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child[.]" *Id.* § 161.001(b)(1)(E).

"Endangerment under subsection (D) arises from a child's environment and a parent's disregard for the potential for danger created by the environment." *In re I.V.H.*, No. 01-19-00281-CV, 2019 WL 4677363, at *5 (Tex. App.—Houston [1st Dist.] Sept. 26, 2019, no pet.) (mem. op.) (citing *Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied)). Subsection D's focus is the child's environment; however, parental conduct may create an endangering environment. *Id.* (citing *In re M.T.W.*, No. 01-11-00162-CV, 2011 WL 6938542, at *12 (Tex. App.—Houston [1st Dist.] Dec. 29, 2011, no pet.) (mem. op.)). Under subsection D, parental rights may be terminated based on a parent's single act or omission. *In re A.B.*, 125 S.W.3d 769, 776 (Tex. App.—Texarkana 2003, pet. denied).

A finding under subsection E can be "evidenced not only by the parent's acts, but also by the parent's omissions or failures to act." *In re S.K.*, 198 S.W.3d 899, 902 (Tex. App.—Dallas 2006, pet. denied). "Endangerment under subsection (E) arises when a parent's course of conduct jeopardizes the child's emotional or physical health." *In re I.V.H.*, 2019 WL 4677363, at *5 (citing *In re A.J.H.*, No. 01-18-00245-CV, 2019 WL 190050, at *7 (Tex. App.—Houston [1st Dist.] Jan. 15, 2019, no pet.) (mem. op.)). Termination under subsection E requires more than a single act or omission and "a 'voluntary, deliberate, and conscious course of conduct

28

by the parent is required.'" *In re L.E.S.*, 471 S.W.3d 915, 923 (Tex. App.—Texarkana 2015, no pet.) (quoting *Perez v. Tex. Dep't of Protective & Regulatory Servs.*, 148 S.W.3d 427, 436 (Tex. App.—El Paso 2004, no pet.)). An inference of danger to a child's well-being may come from parental misconduct. *See Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re K.P.*, 498 S.W.3d 157, 171 (Tex. App.—Houston [1st Dist.] 2016, pet. denied). "A parent's past endangering conduct may create an inference that the parent's past conduct may recur and further jeopardize a child's present or future physical or emotional well-being." *In re M.M.M.*, No. 01-17-00980-CV, 2018 WL 1954178, at *10 (Tex. App.—Houston [1st Dist.] Apr. 26, 2018, pet. denied) (mem. op.) (citing *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.)).

Since evidence of statutory grounds D and E is often interrelated, we may consolidate our review of the evidence supporting these grounds. *See In re M.Y.G.*, 423 S.W.3d 504, 510 (Tex. App.—Amarillo 2014, no pet.); *see also In re A.J.H.*, 2019 WL 190050, at *8. "Both subsections D and E of section 161.001(1) use the term 'endanger.'" *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (addressing previous version of the statute). "To 'endanger' means to expose a child to loss or injury or to jeopardize a child's emotional or physical health." *Id.* (citations omitted). In examining endangerment under

29

subsection D, we look to the child's environment, including when a parent is aware of the danger and "consciously disregards[]" the danger or conduct by others that creates an environment that endangers the child's emotional or physical well-being. *Id*. (citations omitted). This inquiry considers the child's environment before he was in custody of the Department. *Id*. "Under subsection E, however, courts may consider conduct both before and after the Department removed the child from the home." *Id*. "It is not necessary that the parent's conduct be directed at the child or that the child actually be injured; rather, a child is endangered when the environment or the parent's course of conduct creates a potential danger which the parent is aware of but disregards." *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.).

The evidence at trial established that Mother had two children, a daughter and her son, Jack. Mother's daughter currently lives with the daughter's biological father. Mother testified that she does not have custody of her daughter. Mother testified that she was charged with child endangerment and abandonment of Jack and of her daughter in 2015. Mother explained that she left her children in her apartment while she went to the store and that she asked a neighbor to watch her children. She testified that she was unaware her neighbor was "high[,]" that she was gone no longer than twenty minutes, but "there was no way I could fight [the

30

charges].” Mother testified the reason Jack ended up in the care of her boyfriend’s parents who later surrendered him to the Department was because she was incarcerated for violation of her probation for child endangerment and abandonment and “a child support case[.]”

Mother also testified that she was involved in at least two abusive relationships and that Jack was with her when she was in one of the relationships. Mother testified that she believed that Jack’s behavioral issues developed after he witnessed one of Mother’s boyfriends being abusive to her. Testimony also established that Mother was living with another abusive boyfriend, Marcus, after Jack was in the Department’s custody and although Department employees offered to help Mother leave Marcus, she did not accept the help. Mother stated that before trial she left Marcus, she lived in her car, stayed with a coworker and eventually moved in with her friend Michaela. Mother also testified that Marcus had a problem with methamphetamines and alcohol.

Easley testified that although Mother had remained in contact with the Department and generally been cooperative, Mother did not cooperate with the Department’s drug testing requests. Mother testified that she did not attend her drug testing about “80 percent” of the time because she was working when the Department called her to take tests. Mother admitted that in the past she did

methamphetamines, but she insisted that she had not done drugs in seven years. Mother testified that during this case she was employed, and after leaving her abusive boyfriend, Mother lived with a coworker and in her car for a short period. Finally, Mother testified that although she was starting a job the next week, she was living with Michaela and that she would have to find a place to live if the trial court placed Jack with Michaela but she did not then have the funds to pay for her own place.

Considering the entire record, we conclude that the trial judge could have reasonably formed a firm belief or conviction that termination of Mother's parental rights was proper under subsections D and E. *See In re J.F.C.*, 96 S.W.3d at 264–65. There was testimony that Mother had been convicted of felony child endangerment and abandonment of Jack, that she was placed on probation for her conviction, and later she was incarcerated for probation violations and for nonsupport of her other child. The trial court could have reasonably believed that Mother had engaged in conduct that endangered Jack by exposing him to a life of uncertainty and instability and that she had jeopardized his emotional or physical health. *See In re S.R.*, 452 S.W.3d at 360 (subsections D and E both use the term "endanger[,]" which means "to expose a child to loss or injury or to jeopardize a child's emotional or physical health[]").

Because we have concluded that the evidence was legally and factually sufficient to establish predicate grounds for termination under (D) and (E), we need not address the sufficiency of the evidence to support a violation of subsection O. *See In re A.V.*, 113 S.W.3d at 362; *In re D.S.*, 333 S.W.3d 379, 388 (Tex. App.—Amarillo 2011, no pet.) ("If multiple predicate grounds are found by the trial court, we will affirm based on any one ground because only one is necessary for termination of parental rights.").

We overrule Mother's first three issues.

## VI. Best Interest Findings Under Subsection 161.001(b)(2)

In Father's second and third issues, he argues termination of his parental rights is not in Jack's best interest. In Mother's fourth issue, she argues termination of her parental rights is not in Jack's best interest. "[T]here is a strong presumption that the best interest of a child is served by keeping the child with a parent." *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *see also* Tex. Fam. Code Ann. § 153.131(b). In reviewing whether termination is in a child's best interest, we consider a non-exhaustive list of factors: (1) desires of the child; (2) emotional and physical needs of the child now and in the future; (3) emotional and physical danger to the child now and in the future; (4) parental abilities of the individuals seeking custody; (5) programs available to assist these individuals to promote the best interest of the

child; (6) plans for the child by these individuals or by the agency seeking custody; (7) stability of the home or proposed placement; (8) acts or omissions of the parent which may indicate that the existing parent-child relationship is improper; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

The list is not exhaustive, but simply indicates considerations that have been or could be pertinent. *See id.* at 372. However, the best-interest determination neither requires proof of any unique set of factors nor limits proof to any specific factors. *In re D.M.*, 58 S.W.3d at 814 (citing *Holley*, 544 S.W.2d at 371-72). There is no requirement that the party seeking termination prove all nine factors. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). Undisputed evidence relating to one single factor may be adequate in some cases to support a finding that termination is in the best interest of the child. *Yonko v. Dep't of Family & Protective Servs.*, 196 S.W.3d 236, 243 (Tex. App.—Houston [1st Dist.] 2006, no pet.). Evidence supporting the termination of parental rights under subsection 161.001(b)(1) is also probative of best interest. *In re C.H.*, 89 S.W.3d at 28. "On the other hand, and although we acknowledge the trial court is the sole judge of a witness's credibility, we may not disregard evidence that does not support the trial court's best interest finding." *In re E.D.*, 419 S.W.3d 615, 619 (Tex. App.—San Antonio 2013, pet. denied).

## A. Best Interest Finding as to Father

### 1. Desires of the Child

Jack was seven years old at the time of trial and he did not testify as to his desires for placement. Testimony showed that the only personal contact that Jack has had with Father was early in his life when Father's sister brought Jack to prison to visit his Father. Father testified that he sent Jack cards and drawings in the mail.

### 2. Emotional and Physical Needs and Danger to Jack

Father stated that he was then serving a fifteen-year sentence for aggravated robbery, but that he may be eligible for parole in February 2020. Father stated he was unaware that Mother was pregnant with Jack when he committed his crime. Father testified that he had not been able to work in prison and had not provided support for Jack. Father stated that if he was released from prison, he would go live with his sister and would take any job he could get to support his child. Father stated that although he did not work in prison because of the heat, once he was released from prison, he believed he could work construction jobs. Although Father believed he would be eligible for parole soon, this testimony was based on speculation and Father did not provide any evidence that he could provide support for Jack or that other members of his family had agreed to care for and support Jack.

### 3. Father's Parenting Abilities and Proposed Placement for Jack

Father stated that although he was in prison, he had tried to maintain contact with his son and believed that he could provide emotional support for his child even if he was in prison. Father testified he was aware of Jack's behavioral issues and he believed he could provide a unique perspective and support for his child. According to Father, his own experience in foster care would help him to relate to his son and provide emotional support for Jack. Father also stated that he had taken rehabilitative classes in prison including drug rehabilitation and gang renouncement. Father also stated that he believed his sister or Michaela could care for Jack while he finished his prison sentence.

### 4. The Department's Plan for Jack, Programs Available, and Stability of Proposed Placement

Testimony revealed that Jack suffered from severe behavioral issues and, according to the CASA, he was doing "about the same[]" at the time of trial as when she first saw him. Testimony showed that Jack was then placed in a group home and that he was not receiving specialized care at the group home. The CASA testified that once Father was released from prison the court could assess at that time appropriate contact and visitation between Jack and Father, and that possible placement with Father in the future should not necessarily be ruled out.

Viewing the evidence in the light most favorable to the judgment, we conclude that there was legally sufficient evidence to terminate Father's parental rights. A reasonable factfinder could form a firm belief or conviction that Father had provided merely speculative testimony about his parole eligibility and his proposed placements for the child, and the evidence firmly satisfied at least two of the *Holley* factors—the plans for the child by the individuals or the agency seeking custody and the stability of the home or proposed placement. *See Yonko*, 196 S.W.3d at 243 (The trial court may find it legally sufficient and in the child's best interest to terminate the parent-child relationship based on a single finding under the *Holley* factors).

Examining all the evidence, both supporting and contrary to the judgment, we also conclude that the evidence was factually sufficient to support the trial court's finding that termination of Father's rights was in Jack's best interest. *See In re J.F.C.*, 96 S.W.3d at 266 (explaining that the appellate court's analysis should determine whether the fact finder, under a clear and convincing standard of proof, could have formed a firm belief or conviction). Given all of the evidence before the trial court, including the incarceration of Father, the child's need for continued treatment for behavioral issues, the testimony that Father had not been present in Jack's life, and that Jack did not have a relationship with his Father, Father had only met the child a couple of times, and Father may not be released from prison until the child is a

37

teenager, we conclude that a reasonable factfinder could have formed a firm belief or conviction that termination of Father's parental rights was in Jack's best interest. *See A.S. v. Tex. Dep't. of Family & Protective Servs.*, 394 S.W.3d 703, 714–16 (Tex. App.—El Paso 2012, no pet.) (holding that evidence was legally and factually sufficient to show termination was in the child's best interest when the father was incarcerated, his "sentence and incarceration established that [father] is unable to meet [the child's] emotional or physical needs, presently or in the future[,]" the pair did not have a bond, and that although he stated he would "be there" for the child, he had only met the child once). We overrule Father's second and third issues.

## B. Best Interest Finding as to Mother

### 1. Desires of the Child

Jack was seven years old at the time of trial and he did not testify as to his desires for placement. Testimony at trial established that Jack and Mother have a bond, and Mother exercised her visitation with Jack. The caseworker stated the visits were appropriate.

The CASA stated that the child wants to have a relationship with his Mother, asks about her, and it would be beneficial to the child to have visitation with Mother. Moreover, the CASA testified that it was not in the child's best interest for Mother's

38

rights to be terminated. Mother regularly visited the child, and the Department caseworker described the visits as appropriate and loving.

## 2. Emotional and Physical Needs and Dangers to Jack

Mother stated that, other than her first case with the Department when she left her children alone in her apartment, Jack has lived with her his entire life. The testimony established that Jack has a history of exhibiting emotional and behavioral problems. Mother acknowledged that Jack's behavioral issues could stem from an abusive relationship Mother had with a boyfriend that Jack witnessed. Although Mother claimed she had left that boyfriend, she also had another abusive relationship with another boyfriend, Marcus, with whom she was involved at the time of her probation revocation and testified that the abuse started after Jack's removal. The CASA testified that Mother had not shown any evidence that she could provide Jack with a safe and stable environment, and the CASA did not think it was a good idea for Jack to be placed with Mother after the trial. The CASA and the Department representatives testified that adoption would be in Jack's best interest, and adoption could only occur if the parents' rights were terminated. The CASA also testified that she believed Mother should have some supervised court-ordered access to Jack. The CASA also agreed that the Department had no plan of a foster home or parent available to adopt Jack, if the parents' rights were terminated the Department would

leave Jack with no family and no options at the moment, and the only people interested in Jack were the parents and Michaela.

Mother testified that before her incarceration, she had Jack in counseling, behavioral therapy, and used essential oils to address the child's needs. Additionally, Mother testified that she made arrangements for the child to stay with her boyfriend's parents during her incarceration. The Department was going to leave Jack with her boyfriend's parents until the boyfriend's parents relinquished care to the Department. Mother testified that she told the temporary caregivers about the child's behavioral issues before she went to jail. Mother testified that she would continue to seek treatment for the child if her rights were not terminated. While she had recently relocated to a different city, she also testified that she believed there was counseling and providers for the child in the new location.

The CASA testified that the child's behavior has not improved while in the Department's care, and that after being moved and transferred three times during the pendency of this case, his behavior is the same. The evidence established that while in the Department's care, the child made a threat of self-harm and was actually hospitalized for psychiatric treatment.

### 3. Mother's Parental Abilities

Testimony established that Mother has two children, Jack and his sister. She stated that Jack had lived with her his entire life, other than a brief time when the Department removed the children relating to the child endangerment and abandonment charges. Mother pleaded guilty to felony child endangerment and abandonment, was placed on probation, and violated her probation. Mother stated that she was previously in an abusive relationship and that Jack's behavioral issues started after that relationship. Mother testified that she then left the abusive relationship and was in a relationship with Marcus. Mother testified that Marcus was a drug addict, and he became physically abusive towards her after Jack was placed in the Department's custody. Mother acknowledged that a child should not be around domestic violence. Mother testified that she was aware of Jack's behavioral issues, he was enrolled in counseling and behavioral therapy, and she had treated him with oils like lavender.

The CASA testified that she "couldn't say" whether she believed Mother could provide Jack with a safe and stable environment, and the CASA did not think it was a good idea for Jack to be placed with Mother after the trial. The CASA did not believe that Mother was then currently able to be financially stable or emotionally stable. The CASA observed one visit between Mother and Jack almost

a year before trial. The CASA testified that Jack "seems to want to see [Mother]" and "definitely wants to have a relationship with her." The CASA testified she was concerned because Mother's boyfriend, Marcus, was with Mother at the visit and the CASA "felt like [Jack] didn't want to be near him or with him in that visit[,]" and it concerned the CASA that Mother was still living with Marcus during part of the pendency of the case.

### 4. Mother's Plans for Jack, The Department's Plans for Jack, and Stability of Proposed Placement

Mother requested that Jack be placed with fictive kin, Michaela. Mother was confident that Michaela could care for him, and Mother testified that Jack's placement with Michaela was in his best interest. Testimony established that Jack previously lived with Michaela when he was much younger. Mother acknowledged at the time of trial she was living with Michaela. Michaela testified that she would ask Mother to move out if Jack was placed with Michaela. Mother also agreed that she would move out and find her own place if Jack was placed with Michaela. Mother testified that she did not support Jack during the entire nine months after she was released from jail and stated that she was "never ordered or told to" support him. Mother testified that she provided Jack's clothes and belongings when she was released from jail. According to Mother, she would be starting a job in Tyler, Texas, making $11 per hour and believed that in a couple of months she could support

herself and find housing on that income. Mother testified that she would help pursue therapy for Jack if he was placed with Michaela. Mother stated that she wanted Jack to have a permanent placement and she would financially support Jack if he was placed with Michaela.

The Department representatives testified that currently there were no adoptive options for Jack, and Jack's behavioral issues have prevented him from being placed in a foster home. The Department confirmed that Jack is currently in a group home, and by terminating Mother's rights, it would possibly open more adoption options for Jack. Jack, however, had expressed a desire to have visitation with his Mother and that it would be in Jack's best interest to continue visitation with Mother, at least until a permanent placement could be found for Jack.

### 5. Programs Available to Assist Jack

Testimony established that since coming into the Department's care, Jack had been placed in several foster homes, treated in a psychiatric hospital, and finally placed in a group home. While in the group home, Jack was not receiving one-on-one care. The CASA testified that she did not believe Jack's behaviors had improved and she feared that Jack would remain in the Department's care and not be adopted because of his behavioral issues.

## 6. Acts or Omissions of the Mother

Mother acknowledged that she had been in violent domestic relationships, she left those relationships, and she knew that Jack should not be around domestic violence. Testimony established that Mother missed some of her mandatory drug tests, and Mother testified that about "80 percent" of the time when the call for the test was made, she was working.[3] Mother stated that the drug tests she completed were negative. The Department did not put the results of the completed drug tests into the record. Mother testified that she had not used drugs in seven years and that she attends a faith-based recovery program. Mother admitted that even after her release from her incarceration, she was living with her boyfriend, Marcus, who used methamphetamines and alcohol and abused her after Jack's removal. When questioned about her felony child endangerment and abandonment conviction, Mother acknowledged that she left Jack and his sister alone in her apartment while she went to the store but stated that she asked a neighbor to watch the children while she was gone. Mother testified she was unaware the neighbor was "high" and that the neighbor had called the police after Mother left. Mother acknowledged that she

---

[3] A refusal to submit to a drug test allows a reasonable inference that the person knew he or she would test positive for drug use. *In re C.R.*, 263 S.W.3d 368, 374 (Tex. App.—Dallas 2008, no pet.); *In re J.T.G.*, 121 S.W.3d 117, 131 (Tex. App.—Fort Worth 2003, no pet.).

did not financially support Jack during the pendency of this case but claimed that she was unaware she had to support him. Mother stated that she knew that she would have to financially support Jack if her rights were not terminated. Mother testified that she had provided clothes and belongings to Jack after she was released from jail.

### 7. Other Considerations

### (a) Overview of the Child's Situation

Testimony at trial established that Jack has a long history of behavioral issues, which began after he observed Mother in an abusive relationship. Mother testified she addressed the child's behavior issues with behavioral therapy, counseling, and alternative medicine. Mother stated she told the caregivers during her incarceration of Jack's behavioral issues. The evidence established that since Jack has been placed in the care of the Department, Jack was removed from several foster homes, hospitalized, and ultimately placed in a group home. Department witnesses testified that there are no foster homes available at this time for the child and that no one desires to adopt him. The child's guardian ad litem testified she fears if the parents' rights are terminated, the child will not be adopted and will remain in the Department's care for the remainder of his minor years.

**(b) Guidance From Other Cases**

In *Yonko v. Dep't of Family & Protective Servs.*, the Houston First Court of Appeals held that the evidence was factually insufficient to support termination under section 161.001(b)(2) because the facts demonstrated that it would psychologically damage the child not to be with the mother, the mother demonstrated a willingness and ability to parent the child in the near future, and the State's "scant evidence" regarding termination did not overcome the unique situation of the child's emotional and psychological issues that would result with termination. 196 S.W.3d at 249. Other courts have held similarly when addressing cases seeking termination of parental rights involving children with behavioral issues and a lack of evidence to demonstrate an improved benefit toward stability and future plans for potential adoptability. *See In re J.N.*, 301 S.W.3d 429, 434–35 (Tex. App.—Amarillo 2009, pet. denied) (acknowledging that the Department is not required to provide "definitive plans" for the child's future but holding there was no "compelling benefit" by severing parents' parental rights to the child); *see also In re Z.B.*, No. 07-16-00026-CV, 2016 WL 3922936, at *18–20 (Tex. App.—Amarillo July, 12, 2016, no pet.) (mem. op.) (holding evidence was factually insufficient to show best interest when the Department failed to establish that aparent was unfit and "[c]onsidering that there was no foreseeable adoption for the children and no chance

of a permanent and stable home on the horizon, the Department's action to irrevocably terminate [father's] relationship with his children was an extreme measure"); *Gibbs v. Tex. Dep't of Family and Protective Servs.*, No. 03-11-00320-CV, 2012 WL 2979048, at *12 (Tex. App.—Austin July 19, 2012, no pet.) (mem. op.) (ruling evidence was factually insufficient to terminate parent's rights because of "overwhelming weight of the evidence, mostly through uncontroverted testimony by objective, uninterested expert witnesses, [ ]that it is in the children's best interest for [parent] to maintain his rights to them[,]" and the only contrary testimony is "that permanent adoptive home, the likes of which had not been located, would be preferable"); *In re J.P.*, No. 02-10-00448-CV, 2012 WL 579481, at *9–10 (Tex. App.—Fort Worth Feb. 23, 2012, no pet.) (mem. op.) (holding evidence factually insufficient to support that termination of parent's parental rights was in the child's best interest considering child's extreme behavioral issues, there was no foster family interested in adopting the child at time of trial, the child and parent had a strong bond, and parent was the only consistent presence in the child's life; evidence of the parent's unstable housing, his views on domestic violence, and continued drug usage was not enough to overcome the strong presumption to maintain the parent child relationship); *In re R.W.*, No. 01-11-00023-CV, 2011 WL 2436541, at *12–13 (Tex. App.—Houston [1st Dist.] June 16, 2011, no pet.) (mem. op.) (stating evidence

47

was factually insufficient because parent's failure to comply with service plan was not due to "indifference or malice," and "[g]iven the nature of the [parent's] offending behavior and the bond between her and her children, coupled with the children's uncertain future in regard to an adoptive placement, the factfinder could not have reasonably formed a firm belief that terminating the parental rights of the person with whom the children have the best chance of being a family together, is in their best interest").[4]

Other termination cases have affirmed on the best interest element when the child had behavioral problems. For example, in *In re K.C.,* 219 S.W.3d 924, 929–30 (Tex. App.—Dallas 2007, no pet.), the Dallas Court of Appeals affirmed the termination and noted that the child had special behavioral needs that were

---

[4] The Texas Supreme Court has held that lack of definitive plans regarding the child's adoptability or potential placement in the future is not dispositive to demonstrate that termination is not in the best interest of the child. *See In re C.H.,* 89 S.W.3d 17, 28–29 (Tex. 2002). In *In re C.H.*, the Supreme Court explained that the child was in foster care and that a lack of testimony from the foster family about adopting the child does not reach an inference that the family was not considering adopting the child or a lack of potential placement. *Id.* at 28. The lack of evidence regarding the child's future cannot be regarded as a sole ground for reversal. *Id.* *In re C.H.* is distinguishable from the case currently before us today because the evidence showed that the C.H. was in foster care and "developing normally and that he was an emotionally stable, happy boy." *Id.* at 21. Here, testimony demonstrated that Jack's behavior had not improved while in the Department's care, and he has bounced around between placements, including several hospitalizations, ultimately ending up in a group home, and there are no current prospects of a foster placement or of being adopted.

improving, the child was progressing in his foster home, and the child could be "adoptable under continued care[.]"Similarly, in *J.K. v. Tex. Dep't. of Family & Protective Servs.*, No. 03-18-00814-CV, 2019 WL 1646268, at *3–4 (Tex. App.—Austin Apr. 17, 2019, pet. denied) (mem. op.), The Austin Court of appeals found the evidence was factually sufficient on best interest where children with severe behavioral problems had improved in foster care, there was someone who planned to adopt them, and the children were going to be enrolled in therapy. *See also In re S.J.N.*, 14-18-00529-CV, 2018 WL 6494256, at *8–9 (Tex. App.—Houston [14th Dist.] Dec. 11, 2018, pet. denied) (mem. op.) (explaining that it was in the child's best interest to terminate father's parental rights because although the Department did not have proposed permanent placements for the children and the children were in a group home, the group home was meeting all their needs and the children were performing well). We find each of these cases distinguishable because in each case, the evidence presented by the Department showed the children were performing well and the current placements had shown to be beneficial to the children. In the case at bar, the evidence has shown no improvement or benefit to the child.

Nevertheless, under a legal sufficiency review, an examination of the *Holley* factors demonstrates some evidence that termination is in the child's best interest: (1) Mother's prior acts of neglect; (2) an abusive relationship with her former

boyfriend with whom she and the child lived; (3) the missed drug tests; (4) lack of her own housing and inconsistent employment, as well as lack of parenting skills. Therefore, viewing the evidence in a light favorable to the trial court's findings, there was legally sufficient evidence to support the finding. *See In re J.F.C.*, 96 S.W.3d at 266.

That said, we must still examine the factual sufficiency. In reviewing the factual sufficiency of the evidence, we must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *Id.* We are required to consider the disputed evidence and determine whether a reasonable factfinder could have resolved that evidence in favor of the finding. *Id.* "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* Examining all the evidence, both favorable and contrary to the trial court's best interest finding, we conclude that a reasonable fact finder could not have formed a firm belief or conviction that termination of Mother's parental rights was in the child's best interest at this time. *See id.*; *see also In re A.C.*, 560 S.W.3d at 631.

The Department failed to meet its burden to establish by clear and convincing evidence that terminating Mother's rights would be in Jack's best interest. This is

particularly true considering the trial judge's expressed reservations at the conclusion of the first day of trial that the Department had met its burden under the best interest prong. There was overwhelming evidence presented by both the Department and the CASA that the child needed to maintain a relationship with Mother, such as some type of supervised visitation. The Department representatives as well as the CASA stated that it would be detrimental for the child not to maintain some type of a relationship with Mother. Evidence showed that there was no current placement available for the child other than a group home that was not addressing his behavioral issues, that Jack experienced continued problems while in the Department's care, and that having a relationship with Mother was in the child's best interest. Although the evidence established that Mother had been placed on probation for child endangerment in 2015, the Department did not seek to terminate her rights for that conviction at that time and returned the child to Mother. In light of the child's emotional and behavioral condition, the testimony that Mother and her child are bonded, that the child could be placed with fictive kin, that Mother had agreed to continue therapy for the child, and considering the testimony from both the Department and the CASA that it would be beneficial for Jack to maintain contact with Mother, we conclude in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so

significant that a factfinder could not reasonably have formed a firm belief or conviction. *See In re A.C.*, 560 S.W.3d at 631. Thus, the evidence is factually insufficient to show that termination of Mother's parental rights is in Jack's best interest. *See id.*; *In re J.F.C.*, 96 S.W.3d at 266. We sustain Mother's fourth issue.

## VII. Conclusion

We affirm the trial court's termination of Father's parental rights. We also affirm the trial court's factual findings that Mother violated the predicate acts under section 161.001(1)(b)(D) and (E). As neither Mother nor Father challenged the trial court's determination of conservatorship, we affirm the trial court's appointment of the Department as Jack's managing conservator. But having concluded that the evidence is factually insufficient to support that termination of Mother's parental rights is in Jack's best interest, we reverse and remand to the trial court for a determination of possessory conservatorship rights, visitation, child support, medical support and any other necessary orders as to Mother. *See In re N.L.D.*, 412 S.W.3d 810, 825 (Tex. App.—Texarkana 2013, no pet.).

AFFIRMED IN PART AND REVERSED AND REMANDED IN PART.

_____
CHARLES KREGER
Justice

Submitted on January 6, 2020
Opinion Delivered March 11, 2020

Before Kreger, Horton and Johnson, JJ.

CONCURRING AND DISSENTING OPINION

To the extent the majority sustains Mother's fourth issue, I respectfully dissent. In my view, the trial court could reject the scant evidence Mother offered to show she has the skills and the ability to successfully parent "Jack."[1] And here, the difference between the holding I propose and the resolution the Court reaches turns mainly on a difference in opinion about what inferences the trial court could reasonably have made based on evidence showing that Mother abandoned Jack and has not, during the periods he lived with her, shown she can provide Jack a safe and stable home. I would affirm the judgment terminating Mother's rights to Jack. Because the majority does not, I dissent.

As is relevant here, the record shows that in 2015, a court in Anderson County, Texas convicted Mother for abandoning or endangering Jack.[2] In the hearing at issue in the appeal, Mother testified that in 2015, a court placed her on

---

[1] The majority has used the pseudonym "Jack" to refer to the child who is the subject of the termination proceedings at issue in the appeal. For convenience, I also use that name to refer to the child is the subject of this appeal.

[2] *See* Tex. Penal Code Ann. § 22.041 (Abandoning or Endangering Child). From the testimony, it is impossible to determine whether the criminal court handling Mother's criminal case convicted Mother of a Third-Degree or a State-Jail felony. Either way, however, the conviction is a felony. The State failed to provide the trial court with a copy of the judgment of conviction or the indictment, so it is not in the record on appeal.

1

probation for a period of three years after she was convicted of felony abandonment, an offense which involved Jack.

What inferences could the trial court reasonably make from the evidence showing Mother had a 2015 conviction for abandoning Jack? In my opinion, the trial court could have inferred Mother intentionally abandoned Jack in a place that, under the circumstances, exposed him "to an unreasonable risk of harm."[3] The majority appears to agree with that, as it affirms the trial court's finding that Mother engaged in conduct that endangered Jack.[4]

The conviction for abandonment also supports the inference that Mother left Jack in a location where no reasonable adult would have left him, given his age.[5] While Mother denied that is what occurred, the trial court, as the factfinder, could have rejected Mother's account claiming she left Jack at home while under the care of another adult.[6] In my opinion, the majority either disregards Mother's conviction

---

[3] *Id*. § 22.041(b) (describing the elements of the offense of felony abandonment of a child).

[4] *See* Tex. Fam. Code Ann. § 161.001(2)(b)(1)(E).

[5] *See* Tex. Penal Code Ann. § 22.041(a) (defining *abandon* to mean leaving "a child in any place without providing reasonable and necessary care for the child, under circumstances under which no reasonable, similarly situated adult would leave a child of that age and ability").

2

for abandonment or places little weight on it when it reviews the evidence admitted in the trial relevant to Jack's best interest. In other words, the majority seems to accept Mother's account downplaying the factual circumstances that led to her conviction on the abandonment charge. But the trial court did not have to accept Mother's account about what occurred in 2015.[7]

Mother's conviction for abandoning Jack is relevant evidence the trial court could consider in evaluating Jack's best interest.[8] When reversing a trial court's best-interest finding, the reviewing court's opinion must explain why the trial court could not have formed a firm conviction about the best-interest finding a parent has challenged in the appeal.[9] In the best-interest discussion the majority provides us, it mentions Mother's felony-abandonment conviction only in passing when describing Mother's ability as a parent. Even then, the reference appears merely as background about how Mother, as a historical matter, parented Jack. The opinion fails to explain whether the majority concludes the evidence about Mother's conviction was not

---

[6] *See City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005) (explaining that as the sole judge of the credibility of the witnesses, the factfinder "may choose to believe one witness and disbelieve another").

[7] *Id.*

[8] *See In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

[9] *Id.*

relevant or weighed too heavily when the majority reviews the evidence in the record about Jack's best interest. In my view, the standard of review requires the reviewing court to assume the trial court weighed the evidence heavily against Mother when it conducted its analysis, and the evidence supports the trial court's view based on the other evidence that tends to show Mother's ability as a parent is extremely poor. Even if the majority gave the abandonment conviction some weight in its review, the opinion does not tell us how much. Nor, does the opinion explain why the trial court did not have the right to give the evidence a great deal of weight.

Other evidence in the record provides more support for the trial court's decision terminating Mother's rights to Jack. In general, the evidence allowed the trial court to conclude Mother cannot provide Jack a safe, stable, and drug-free home. For instance, the record shows that Mother has not lived up to her obligations to her daughter as her non-custodial parent. Mother explained she has visitation rights to her daughter. She also has an obligation to pay her daughter child support. Mother explained her daughter's father will not allow her to take that child to see Jack. The daughter's father requires Mother to exercise her visitation rights to that child in his home. Mother pays $213 a month in child support based on a court order in support for her daughter, but Mother agreed in the trial she is and has been in arrears. According to Mother, the family law court handling her daughter's case had found her in contempt following a child support hearing where she failed to appear.

4

Mother admitted the family judge handling her daughter's case had sentenced her to jail for contempt. In my opinion, the evidence showing that Mother has not complied with the duties she owes her daughter is more evidence the trial court could have relied on when concluding Mother lacks the parenting skills, ability, and resources to provide Jack a safe, stable home.

Other evidence in the record shows Mother has not provided Jack with a stable home. When Mother was indicted and convicted on the charge of felony abandonment, she and Jack were living in Anderson County with a man named Leon. When Leon physically abused Mother, in Jack's presence, Mother left Anderson County with Jack. They moved to Liberty County, where Mother and Jack began living with a man named Marcus. Marcus was living on property owned by his parents. The record does not show what Marcus or Mother did to earn money while Mother lived with him. While in Liberty County, authorities from Anderson County arrested Mother for violating the conditions of her parole. By violating the conditions, Mother left Jack without having an available parent to raise him after Mother went to jail.

Mother downplayed the parole violation during this trial. The majority appears to view the violation as minor, as it apparently accepts the explanation Mother provided about the reason the violation occurred. But as the finder of fact, the trial court did not have to accept Mother's explanation. And the trial court had

5

the right to weigh the evidence of the violation heavily against Mother by, viewing the conduct as all the more reckless because Mother knew no other relatives were available to care for Jack if she violated her parole. Given Mother's lack of choices about where to place Jack, she placed him with Marcus's parents while she went to jail. Marcus's parents decided they could not manage Jack and they turned him over to the Department. Thus, the choices Mother made to violate her parole left Jack a ward of the State.

Finally, the majority's best-interest analysis appears to rely heavily on the evidence that tends to show the Department has no concrete adoptive options for Jack at the current time. While evidence about placement plans and adoption are relevant to a trial court's decision about what is in a child's best interest, "the lack of evidence about definitive plans for permanent placement and adoption cannot be the dispositive factor; otherwise, determinations regarding best interest would regularly be subject to reversal on the sole ground an adoptive family has not yet been located."[10] Our job, however, is not to determine whether the options the Department offered are better than the options proposed by Mother. Instead, we must decide whether the evidence allowed the trial court to "reasonably form a firm conviction or belief that termination of the parent's rights would be in the child's

---

[10] *Id.*

best interest—even if the agency is unable to identify with precision the child's future home environment."[11] Witnesses from the Department explained in the hearing they were awaiting the trial court's decision in the case to move forward with finding Jack a more permanent home.

The evidence described when viewed in the light that favors the trial court's finding allowed the trial court to form a strong belief or conviction that Mother cannot provide stable housing for herself or a child. Even after leaving prison in May 2018, Mother continued to show that she cannot provide herself with housing on her own. In May 2018, Mother returned to Marcus's home. Marcus, however, began hitting Mother after she moved back in. Yet Mother stayed with Marcus until March 2019, around nine months after she moved back in. According to Mother, Marcus uses drugs and alcohol and his abuse of these substances led him to abuse her. Mother was aware Marcus used illegal substances and did so in the home. According to Mother, Marcus has substance abuse problems. Mother described Marcus's problems as significant, explaining Marcus is currently in an in-patient drug rehab program. According to Mother, drug treatment is something Marcus "absolutely needs[.]" Upon leaving Marcus, Mother had nowhere to go. She chose to live with a coworker from March 2019 until shortly before the trial in late-July 2019. After

---

[11] *Id.*

moving out, Mother moved in with her friend Michaela. But according to Mother, she plans to find her own place to live if the trial court required her to do so and if the court would adopt the plan she proposed asking the court to give Michaela custodial rights, on a temporary basis, to Jack.

And, the trial court could have inferred from the testimony that Mother uses men and her friends to provide her a home. The testimony in the case shows Mother has lived in only two homes with Jack. Neither home proved stable. In both, Mother lived with men who began abusing her, one while Jack was living in the home. Mother then moved to Liberty County but chose to live with a man she learned was using illegal drugs. After Jack was no longer there, that man also began abusing her. Since then, Mother has lived with her friends because she is without the resources she needs to rent a place of her own.

All this evidence together with the evidence showing Mother abandoned Jack in 2015 in a place that exposed him to an unreasonable risk of harm is evidence relevant to the trial court's best-interest finding. Evidence about a parent's past conduct is probative and relevant to such a finding.[12] To reverse, the majority must clearly explain why the trial court could not reasonably rely on this evidence to

---

[12] *See In re J.D.*, 436 S.W.3d 105, 119 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (explaining a parent's decisions that affect the stability of the home the parent has provided in the past is relevant when reviewing a trial court's best-interest finding).

decide Mother has exhibited a pattern of conduct "that is inimical to the very idea of childrearing."[13] The majority opinion fails to clearly explain why the trial court could not rely on this evidence, so the opinion we issue must be reversed given the standards that apply to reviewing a trial court's decision terminating a parent's rights.[14]

In conclusion, giving proper deference to the trial court's best-interest finding, the trial court could have reasonably formed a firm belief or conviction that terminating Mother's rights is in Jack's best interest. I agree with the opinion to the extent that we affirm the judgment as to Father's appeal. To the extent the majority reverses the ruling terminating Mother's parental rights, I respectfully dissent for the reasons explained above.

_____
HOLLIS HORTON
Justice

Concurrence/Dissent Delivered March 11, 2020

---

[13] *In re C.H.*, 89 S.W.3d at 28.

[14] *Id.* at 28-29.